**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **IN RE** | § | |
| | § | |
| **JOHN RICHARD PERULLO,** | § | **CASE NO. 3:25bk30909** |
| | § | **CHAPTER 7** |
| **DEBTOR.** | § | |

| | | |
|---|---|---|
| **KRUGER PACKAGING, LP,** | § | |
| | § | |
| ***Plaintiff,*** | § | **ADVERSARY PROCEEDING** |
| | § | |
| **V.** | § | **CASE NO. 25-03018-cgb** |
| | § | |
| **JOHN RICHARD PERULLO,** | § | **Judge: Christopher G Bradley** |
| | § | |
| ***Defendant.*** | § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Bankr. P. 7056 and Fed. R. Civ. P. 56, Plaintiff Kruger Packaging, LP ("Kruger" or "Plaintiff") files this Motion for Summary Judgment against Defendant John Perullo ("Perullo" or the "Debtor"), and respectfully states as follows:

## I. INTRODUCTION

There is no genuine issue of material fact that the Debtor made intentional fraudulent transfers to his spouse in the year prior to the bankruptcy filing with the intent to hinder, delay, or defraud Plaintiff by putting such assets out of Plaintiff's reach. The fact that the Debtor made transfers to his spouse, including for the benefit of his adult children, in the year prior to the bankruptcy case is undisputed. Moreover, the Debtor's requisite fraudulent intent is clearly established by (i) the Debtor's own admissions under oath; and (ii) the overwhelming presence of badges of fraud establishing intent. The Debtor testified as follows:

> **Q.** So it sounds like you were prioritizing payments to Beth above these credit cards; is that correct? **A**. Yes. **Q**. And also above your debt to Kruger, correct? **A**. Yes.

The Debtor then admitted the following:

> "My wife and kids are my priority . . . I chose to let the courts deal with it and file for bankruptcy while continuing to make payments to my wife and kids, yes."

While Kruger pursued the Debtor on a judgment of over $1.5 million, the Debtor transferred huge sums to his wife under the guise of an unsigned, draft, and legally unenforceable marital separation agreement and at the same time did not pay a single dime owed to Kruger. When his wife asked for money, he would unquestioningly transfer her whatever she asked for. He then used bankruptcy as a tool to avoid any payment to Kruger so that he could continue to pay insider family members and avoid further collection efforts by Kruger. Accordingly, the Debtor is not an "honest but unfortunate debtor" entitled to a discharge pursuant to Section 727 of the Bankruptcy Code. "While a bankrupt is entitled to adjust his affairs so that some planning of one's exemptions under bankruptcy is permitted, a wholesale sheltering of assets which otherwise would go to creditors is not permissible." *In re* Zouhar, 10 B.R. 154, 157 (Bankr. D. N.M. 1981). The Court should grant summary judgment in favor of Plaintiff and deny the Debtor a discharge.

## II. SUMMARY JUDGMENT EVIDENCE

This Motion is supported by the Declaration of David Wills and the following exhibits attached thereto, which are incorporated herein by reference and incorporated for all purposes:

**Exhibit A** Bank of America Checks

**Exhibit B** Bank of America Statements

**Exhibit C** Deposition of John Perullo, June 29, 2026 (the "First Deposition")

**Exhibit D** Draft Separation Agreement

**Exhibit E** Bankruptcy Schedules

**Exhibit F** Life Insurance Policy

**Exhibit G** Defendant's Answer

**Exhibit H** Plaintiff's Judgment

**Exhibit I** 24 Gina Way Zillow Page

## III. STATEMENT OF UNDISPUTED FACTS

### A. The Debtor Files for Bankruptcy to Evade Kruger.

In 2018, Debtor was the sole member of Corrugated Synergies International, LLC ("CSI"). At the time, CSI was in the process of launching two newly formed wholly owned subsidiaries: Visual Impact Preprint, LLC ("VIP") and Universal Sheets, LLC ("Universal"). Complaint, ¶ 6, Answer, ¶ 6. Kruger entered into a loan agreement with CSI to provide CSI with short-term funding. The Debtor guaranteed the loan agreement. Complaint, ¶¶ 8-10, Answer, ¶¶ 8-10. Essentially, Debtor took Plaintiff's funds for a project that never materialized and then failed to repay them; since then, Plaintiff has been chasing its monies, despite the Debtor's repeated history of dilatory tactics.

In 2020, Plaintiff filed a lawsuit in Quebec, Canada against CSI and the Debtor for amounts owed under the loan documents and obtained judgment against the Debtor and CSI on May 30, 2023. Complaint, ¶¶12-13, Answer, ¶¶ 12-13. Thereafter, the Texas District Court for El Paso County, Texas, recognized and issued judgment in favor of Plaintiff in the amount of $1,656,835.67, with interest at an annual rate of 10% accruing as of January 24, 2024, plus all costs and legal fees. Complaint, ¶ 13, Answer, ¶ 13; **Ex. H**. Plaintiff sought post-judgment discovery against the Debtor, filed a motion to compel, and threatened to file a second motion to compel against the Debtor unless he filed full and complete responses and production by July 21, 2025. On July 17, 2025, the Debtor filed his bankruptcy petition.

### B. Examples of Transfers in the Year Preceding Bankruptcy

The Debtor's bankruptcy case, case number 25-30909-cgb (the "Main Case"), was initiated when the Debtor filed for bankruptcy on July 17, 2025. Main Case, Dkt. 1. Thus, the period beginning one year prior to the Debtor's filing for bankruptcy (the "One-Year Period") was from July 17, 2024, to July 17, 2025. During the One-Year Period, the Debtor made at least the following transfers to his wife, Beth Perullo:

- September 10, 2024 — $40,000.00 Bank of America check;[1]
- December 15, 2024 — $6,000.00 Bank of America check;[2]
- March 28, 2025 — $3,498.00 Zelle payment;[3]
- March 31, 2025 — $40,000.00 Bank of America wire transfer;[4]
- April 1, 2025 — $20,000.00 Bank of America wire transfer;[5]
- April 14, 2025 — $10,000.00 Bank of America transfer.[6]

### C. Debtor Is Still Married and the Draft Separation Agreement Was Not Signed

According to the Debtor, after Plaintiff commenced suit against him, he negotiated an unfinalized marital separation agreement with his wife, Beth Perullo, in late 2021. All of the transfers identified above were allegedly made pursuant to the Draft Separation Agreement, a draft that was last modified in 2023, and is not signed.[7] The Draft Separation Agreement will need to be negotiated and modified before it can be finalized and signed.[8] It must also be adopted by a court order before it is legally binding under both Texas and Massachusetts state law.[9] Debtor and his wife are still married and still share community property.[10] Although Debtor lives apart from his wife, he moved away from her for work reasons.[11] The marital discord allegedly began about one year *after* Plaintiff had sued Debtor in Canada.[12]

Moreover, the Draft Separation Agreement was most recently modified in May of 2023, the same month that the original final judgment was entered against the Debtor.[13] The modification specifically included provisions allocating the Debtor's business liabilities to Debtor alone, with

1 **Ex. A**.
2 *Id*. As will be explained, FOJP, LLC, is a single purpose entity, and its sole purpose is to benefit John Perullo by buying and owning the house that Beth Perullo lives in at 24 Gina Way.
3 **Ex. B**.
4 *Id*.
5 *Id*.
6 *Id*.
7 **Ex. D.** *See also* **Ex. C**, 108:25–109:3.
8 **Ex. C**, 181:7–11.
9 **Ex. C**, 140:7–10.
10 *See* **Ex. E** at 3, 4 and 16; **Ex. C**, 211:2–10.
11 **Ex. C**, 86:9–87:24.
12 **Ex. C**, 76:15–17, 77:4–16.
13 **Ex. D** (footnote states "Draft 3May 2023"); **Ex. C**, 91:14–17.

his wife being indemnified and held harmless—insulating an insider from Kruger's judgment at the same time that the court was entering its judgment against the Debtor.

### D. Undisclosed Transfers Pursuant to the Draft Separation Agreement

It is undisputed that during the One-Year Period the Debtor made transfers to his wife, allegedly pursuant to the Draft Separation Agreement, in addition to the transfers evidenced by **Ex. A and Ex. B** and identified above.[14] For example, Debtor testified that he pays his wife, Beth Perullo, $10,000.00 per month for "child support" or "alimony"[15] in lump sum quarterly payments made in advance of the respective quarter.[16] Additionally, Debtor pays for life insurance that carries a death benefit of between $2 million and $5 million payable to Beth Perullo.[17]

Not all of the transfers to Beth Perullo are made directly to her. For example, some transfers were made to FOJP, LLC ("FOJP"), which likely stands for: "for John Perullo."[18] FOJP is a single purpose entity created by an affiliate of the Debtor's employer. The single purpose of FOJP is to buy 24 Gina Way, a million-dollar property, and rent it to Beth Perullo as a favor to the Debtor.[19] Beth Perullo is the only permanent resident as their youngest child is grown and in college.[20] The

---

[14] Even **Ex. A and B** were not disclosed by the Debtor to Plaintiff. Rather, Plaintiff obtained **Ex. A and B** through third-party discovery to Bank of America.

[15] Debtor used the terms "child support" and "alimony" interchangeably when making the payments, despite acknowledging their distinct meanings. **Ex. C**, 100:21–25.

[16] **Ex. C**, 98:24–99:9; 195:9–24; 267:22–268:3.

[17] **Ex. C**, 183:9–184:6. Debtor claims to have a life insurance policy with at least $2 million in benefits payable to Beth Perullo, but he failed to produce a copy of such policy despite a promise to do so. The life insurance policy that Debtor did produce shows a benefit payable to Beth Perullo of $5 million. *See* Life Insurance Policy, **Ex**. F.

[18] **Ex. C**, 63:14–64:2 ("Q: Do you know what those letters stand for? A: I don't. Q: The JP, does that stand for John Perullo? A: I guess it does, yeah. Q: It seems like an entity for John Perullo, FOJP. Would that make sense to you? A: I would think so, yeah. I don't know what the name of it is or why they called it that. But it's a special purpose entity."). *See also* **Ex. I**.

[19] **Ex. C**, 60:12–23 (FOJP formed by "one of the partners of Franklin Mountain Packaging" for the purpose of purchasing Beth's house); 64:1–6 (confirming FOJP is "a special purpose entity" whose only purpose is to "purchase that house and . . . rent it back to Beth."); 64:11–65:6 (FOJP did a "nice thing" for Debtor by buying the house and leasing it to Debtor's wife, even though Debtor is paying "over market rate and gaining no equity." FOJP did this "nice thing" because Debtor is an "fairly important person in that group" and the Debtor did not request lower rent because "you don't look a gift horse in the mouth").

[20] **Ex. C**, 17:19; 18:1–11 ("That's Beth's house, 24 Gina Way in Boxford"); 18:6–11 (confirming all four children live at Gina Way only when home from school for breaks and the like).

Debtor is not a party to the rental agreement between Beth Perullo and FOJP.[21] Nevertheless, the Debtor testified that Beth Perullo is obligated to pay $6,000.00 a month in rent to FOJP.[22]

On April 14, 2025, to allegedly satisfy Beth Perullo's obligation to pay rent to FOJP, Debtor transferred a lump sum payment of $90,000.00 to FOJP, to allegedly cover 15 months of rent.[23] To accomplish this, in addition to the $10,000.00 Bank of America transfer cited above and evidenced by **Ex. B**, Debtor also transferred an additional $80,000.00 from Westar Bank.[24] Other than the Debtor's testimony, no record of the $80,000.00 transfer from Westar Bank, or ***any*** records from Westar Bank, have been provided to Plaintiff despite discovery requests.[25]

**E. No Value or Reasonably Equivalent Value for the Debtor's Transfers**

Debtor claims that all of the transfers to Beth Perullo and FOJP in the One-Year Period were made pursuant to the Draft Separation Agreement, or what the imagined final separation agreement would ultimately look like.[26] That Draft Separation Agreement was drafted by a mediator that Beth Perullo selected, and the Debtor agreed the terms that his wife asked for.[27] The Debtor testified that he received no value under the Draft Separation Agreement that transferred millions of dollars of value to his wife.[28] In Debtor's words, the benefits under that agreement went only "one direction."[29] The Draft Separation Agreement was most recently modified in May

---

[21] **Ex. C**, 70:1–3 ("I had nothing to do with nor was I involved in the actual transaction…."); 104:4 ("Beth is the one who signed the agreement.").

[22] **Ex. C**, 101:16–17 (first payment under the lease was "$6,000 a month"); 102:15–17 (confirming $6,000/month).

[23] **Ex. C**, 101:6–11 (confirming the April 14, 2025 transfer of $10,000 to FOJP LLC); 101:23–25; 102:1 (testifying that the $90,000 total covered 15 months: "the 6 times 15, 90 total"); 105:6–7 ("the 80 plus the ten").

[24] **Ex. C**, 102:2 ("I sent 80,000 or so out of the West Star Bank" in addition to the $10,000 Bank of America wire, completing the $90,000 total prepayment to FOJP).

[25] Westar Bank did not provide documents responsive to Plaintiff's third-party discovery requests to Westar Bank. Westar Bank is an affiliate of the Debtor's employer and Plaintiff believes that the Debtor has fraudulently transferred assets to his employer and its affiliates, and that Westar Bank thus improperly withheld responsive documents that would support such liability.

[26] **Ex. C**, 115:19–116:1; 140:7–10; 141:8–9; 159:25–160:6.

[27] **Ex. C**, 57:19–23 (identifying Julie Ventola as "the mediator that Beth suggested"); 163:2–15 ("[The mediator and Beth] already had their plans. So that was it.").

[28] **Ex. C**, 160:3–6 ("No. I don't believe there are any [payments or obligations to the Debtor under the separation agreement]. I believe this goes one direction.").

[29] *Id. see also id.* at 160:22–25 (Q: "Nothing to you, No actual . . . benefit flowing to you as opposed to flowing to your kids pursuant to this agreement?" A: "None.").

of 2023, the same month that the original[30] final judgment was entered against the Debtor.[31] In making transfers pursuant to the Draft Separation Agreement, Debtor would trust his wife and transfer to her whatever she asked for.[32]

### F. Insolvency and Preference for Assets to Go to His Wife Rather Than Creditors

Debtor's own deposition testimony confirms that he was fully aware he could not pay both his wife and his creditors, and that he made a deliberate choice to prefer his wife and adult children. When asked directly whether he prioritized payments to Beth above his credit cards and above his debt to Plaintiff, the Debtor answered unequivocally: "Yes."[33] When asked why, the Debtor testified: "My wife and kids are my priority. The Kruger loan was a business loan, albeit collateralized and my personal signature."[34] The Debtor further admitted: "I don't have the funds to pay both groups. But do I think Kruger should have been paid? Yes. But I have to make payments to . . . my wife and kids."[35]

When confronted with the fact that he filed for bankruptcy while continuing to transfer funds to his spouse, the Debtor testified: "I chose to let the courts deal with it and file for bankruptcy while continuing to make payments to my wife and kids, yes. So I filed for bankruptcy to get out of something that was insurmountable at that point for me."[36]

As of January 2020, the Debtor had sufficient assets to cover all obligations. By the petition date, he did not.[37] Debtor confirmed his salary is $400,000 per year, yet he claims to be unable to

---

[30] The original final judgment was entered in a lawsuit in Canada. The Canadian judgment was later recognized in Texas and became a final judgment in Texas.

[31] **Ex. C**, 59:12–17 (reflecting that the draft separation agreement dated "3 May 2023" Debtor believed to be "the latest version of it."); 158:18 ("That says 'draft' 3 May 2023.").

[32] **Ex. C**, 34:5–6 ("She would tell me I need to send her this, that's what I would send her, and then we move on.").

[33] **Ex. C**, 37:11–15 (Q: "So it sounds like you were prioritizing payments to Beth above these credit cards; is that correct?" A: Yes. Q: And also above your debt to Kruger, correct? A: Yes.").

[34] **Ex. C**, 43:4–7.

[35] **Ex. C**, 44:11–14; 45:11–13.

[36] **Ex. C**, 45:19–23.

[37] **Ex. C**, 41:4–8 ("Q: [In January 2020 despite having] this large debt that is being collected, you had enough assets to cover everything? A: No. I had enough assets."); 44:23–24 ("I ran out of resources, and I started running out of resources in January of 2020."); 46:6–11 ("Q. … [F]rom the day before bankruptcy was filed and the year before that . . . you felt like you had obligations to Kruger. You felt like you had obligations to your family. And the fact of the matter is that you were paying to your family what you felt you owed them, but you were not paying to Kruger what you owed them. A: Right.").

pay Kruger. The Debtor has a $400,000 salary and fancy watch collection including a Rolex, but has not paid his creditors because he made a deliberate choice to send over $200,000 per year to his wife while making zero payments to a $1.6 million judgment creditor.[38] Rather than treat his creditors equitably, the Debtor redirected his assets—in lump-sum, irregular payments totaling over $200,000 per year—to his wife in the twelve months before filing for bankruptcy. The Debtor's own words make plain that this was not an oversight: it was a conscious decision to place as many assets as possible in an insider's hands before filing for bankruptcy.

## IV. LEGAL STANDARD

"Under Fed. R. Civ. P. 56(a) courts 'grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Simmons v. Vanguard Res. Inc.*, No. 5:19-CV-0848-JKP, 2020 WL 4738949, at *1 (W.D. Tex. Aug. 14, 2020). "'As to materiality, the substantive law will identify which facts are material' and a fact is 'material' only if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Because there must be a genuine dispute of material fact, 'the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.'" *Id.* (quoting *Anderson*, 477 U.S. at 247-48) (emphasis in original). "There is no genuine dispute for trial when 'the record as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

"In determining whether to grant summary judgment, the courts view all facts and reasonable inferences drawn from the record 'in the light most favorable to the party opposing the motion.'" *Id.* at *2 (quoting *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016)). "If the movant carries that initial burden, the burden shifts to the party opposing the motion to present competent summary judgment evidence showing the existence of a genuine fact dispute."

[38] **Ex. C**, 175:9 (confirming salary of $400,000 per year as of a few months before the Debtor's June 29, 2026 deposition); 229:18–21 (confirming ownership of Rolex and other high-end watch); 37:11–15 (confirming Debtor's prioritizing of payments to spouse above creditors).

*Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "Upon the shifting burden, the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). "In other words, '[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.'" *Id.* (quoting *Heinsohn*, 832 F.3d at 234). "[T]he courts have 'no duty to search the record for material fact issues.'" *Id.* (quoting *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010)). And "[w]hen a party moves for summary judgment on claims on which the opposing parties will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovants' claims." *Armas v. St. Augustine Old Roman Catholic Church*, No. 3:17-CV-2383-D, 2019 WL 2929616, at *2 (N.D. Tex. July 8, 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## V. ARGUMENT

### A. Fraudulent Transfer Under Section 727(a)(2) of the Bankruptcy Code

Under Section 727(a)(2) of the Bankruptcy Code (the "Code"), the "court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C.A. § 727(a)(2)(A). In other words, "a debtor may not be discharged if he fraudulently conceals or transfers property within one year of declaring bankruptcy." *United States v. Willey*, 57 F.3d 1374, 1380 n.14 (5th Cir. 1995). Similarly, a debtor may not be discharged if he fraudulently conceals or transfers property "after the date of the filing of the petition." § 727(a)(2)(B).

The Court should grant summary judgment where, as here, "the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Actual intent of the debtor may be inferred from the actions of the debtor and may be shown by circumstantial evidence. *In re Wiggains*, 848 F.3d 655, 662 (5th Cir. 2017) (quoting *In*

*re Dennis*, 330 F.3d 696, 701-02 (5th Cir. 2003)). However, when the Debtor "admits that he acted with the necessary intent . . . there is no need for the court to rely on circumstantial evidence or inferences in determining whether the debtor had that intent." *Id.* (quoting *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)).

Here, any rational trier of fact would be forced by the record to conclude that the transfers were made with intent to defraud Plaintiff and other creditors, as Debtor openly testified that he made the transfers, with no binding obligation to do so, because he would rather that his limited assets go to his wife than to pay his creditors.[39] Given the Debtor's own admissions, it is unnecessary for the court to rely on circumstantial evidence of badges of fraud. *See In re Wiggains*, 848 F.3d at 662; *In re Smith*, No. 11–15136–JDW, 2014 WL 61233, at *4 (Bankr. N.D. Miss. Jan. 7, 2014) (granting summary judgment as to a fraudulent transfer claim where "[u]ndisputed evidence show[ed] that [the debtor] admitted, under oath, that the purpose of the transfer was [to] keep the property out of the bankruptcy estate").

Additionally, the circumstantial evidence coupled with the Debtor's own testimony clearly and undeniably establishes the Debtor's transfer of property in the year prior to the bankruptcy with the intent to defraud Kruger. *See In re Beverly*, 374 B.R. 221, 236-38 (BAP 9th Cir. 2007) (granting summary judgment as to a fraudulent transfer claim where the debtor made statements about protecting his assets from creditors and several badges of fraud were present); *see also In re Hinsley*, 201 F.3d 638, 643-44 (5th Cir. 2000) ("holding that a "party's self-serving and unsupported claim that he or she lacked the requisite intent under the [fraudulent transfer statute] is not sufficient to defeat summary judgment where the evidence otherwise supports a finding of fraud."). Given the Debtor's prior admissions, no self-serving denial can undo what he already said under oath.

Even if the Debtor's admissions did not conclusively determine his fraudulent intent with respect to his transfers (they do), each of the "badges of fraud" for purposes of § 727 weigh

[39] **Ex. C**, 37:11–15; 37:24–38:2; 43:4–5; 45:19–21.

decisively in favor of granting summary judgment and denying the Debtor's discharge. The Fifth Circuit has recognized various "badges of fraud" that "tend to evidence a transfer made with intent to defraud under § 548 and § 727" and can establish fraudulent intent where that intent is not explicit. *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008). The "badges of fraud" for purposes of § 727 include:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of events and transactions under inquiry.

*Id*. This is not an exhaustive list, and even a few badges of fraud may be sufficient. *See id*. Here, each of the badges of fraud are present.

***First***, lack or inadequacy of consideration is undisputedly present. Because the Debtor received no benefit from the arrangement and all the benefits went in "one direction," as a matter of law, the Debtor did not receive reasonably equivalent value. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 121 (5th Cir. 2019) (citing *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006)). "In short, from the perspective of creditors and fraudulent conveyance analysis, there was no proof of any real consideration" to the Debtor under the Draft Separation Agreement. *In re Kovler*, 249 B.R. 238, 246 (Bankr. S.D.N.Y.), *supplemented,* 253 B.R. 592 (Bankr. S.D.N.Y. 2000), and *corrected,* 329 B.R. 17 (Bankr. S.D.N.Y. 2005).

In the context of transfers made pursuant to a separation agreement, the consideration received by the debtor is reasonably equivalent to the value of the assets transferred if the parties engaged in "'arms-length' bargaining" and the exchange of assets falls "within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated." *In re Hill*, 342 B.R. 182, 196-97 (Bankr. D.N.J. 2006) (quoting *In re Sorlucco*, 68 B.R. 748, 753 (Bankr. D.N.H. 1986)); *see, e.g.*, *In re Williams*, 159 B.R. 648, 663-64 (Bankr.

D.R.I. 1993) (finding that the debtor received less than reasonably equivalent value in an agreement where his ex-wife received "virtually all of the personal property" because that "was not within the range of what a *fully informed* Family Court Judge would order"); *In re Hinsley*, 201 F.3d 638, 642 (5th Cir. 2000) (holding that "credible and undisputed evidence as to the actual value" of the assets at issue established that the debtor did not receive reasonably equivalent value in a partition agreement with his wife). The terms of a marital separation agreement are "not at arm's length," for example, when the Debtor/husband transfers to the wife his interest in the marital home and receives nothing in return. *See In re Kovler*, 249 B.R. 238, 245 (Bankr. S.D.N.Y.), *supplemented,* 253 B.R. 592 (Bankr. S.D.N.Y. 2000), and *corrected,* 329 B.R. 17 (Bankr. S.D.N.Y. 2005).

In Texas, a court dividing property between divorcing spouses is required to do so "in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code Ann. § 7.001. To make this determination, courts consider various factors, including "the nature of the community property, the relative earning capacity and business experience of the spouses, their relative financial condition and obligations, their education, the size of the separate estates, the age, health, and physical conditions of the parties, the fault in breaking up the marriage, and the benefit the spouse not at fault would have received had the marriage continued." *Villalpando v. Villalpando*, 480 S.W. 3d 801, 807 (Tex. Ct. App. 2015).

The Debtor testified that he made transfers to his wife amounting to $192,000 per year both before and since filing for bankruptcy.[40] At minimum, Debtor transferred over $119,000 to his wife within one year of filing his bankruptcy petition, as shown in **Ex. A and Ex. B** and as explained above. In exchange, the Debtor received nothing. The payment obligations under the Draft Separation Agreement all went "one direction"–from the Debtor to his wife.[41] With respect to the division of assets, Debtor's wife supposedly received a larger share of assets—including

[40] *See* **Ex. E** at 18; **Ex. C**, 159:25–156:1; 268:1–3.
[41] **Ex. C**, 159:25–160:25.

two thirds of the Ally Bank account 401(k) rollover. Moreover, testimony indicates that the Debtor bought the Gina Way house in the context of the separation, and that while the SBA foreclosed on the house, the special purpose entity "FOJP, LLC" owns the house, rents it to Beth, and the Debtor makes the rental payments. FOJP LLC was formed by one of the partners of the Debtor's present employer for the express purpose of owning the house and renting it back to the Debtor's wife. The $90,000 lump-sum payment that Debtor made on April 14, 2025 to FOJP, so that his wife could live in the 24 Gina Way house, was *not* negotiated.[42] That number "came just as a set of numbers" that Debtor accepted without any attempt to lower what Debtor admits is "not a low number for rent."[43] This division of assets decidedly benefits Debtor's wife, and the agreement facilitating such division was never signed and was never approved by a court.

***Second***, it is undisputed that the transfers were to Debtor's current wife, the mother of his adult children, who he has been married to for approximately 30 years.[44] The Debtor testified that he would rather see his limited assets go to his wife than to Plaintiff.[45] Thus, the "family, friendship or close associate relationship between the parties" is undisputedly present here.

***Third***, the Debtor likely retained possession and benefit of the property in question, because he admitted in his sworn bankruptcy schedules that he shares community property with his wife.[46] Additionally, the Debtor testified that the only benefit he received from the transfers was that he wants his wife and adult children to be financially secure.[47] Thus, he retained use of the assets for the purpose of making sure that his wife and adult children are financially secure—to the tune of millions of dollars.[48]

***Fourth***, the Debtor testified that for the entire one-year period preceding the filing for bankruptcy, the Debtor had no way to pay his debts.[49] In other words, the Debtor was insolvent

---

[42] **Ex. C**, 104:3–6.
[43] **Ex. C**, 104:3–10.
[44] **Ex. C**, 10:1–20.
[45] **Ex. C**, 37:11–15; 37:24–38:2; 43:4–5; 45:19–21.
[46] **Ex. E**, at 4.
[47] **Ex. C**, 160:20–25.
[48] **Ex. C**, 14:14–16; 15:4–7; 16:21–4; **Ex. F**; **Ex. I**.
[49] **Ex. C**, 44:23–24 ("But I ran out of resources [to pay the debt to Plaintiff], and I started running out of resources in January of 2020.").

prior to and after the transfers made during the one year prior to the Debtor's bankruptcy filing. This includes his debt to Plaintiff, which came due in 2020 and is the basis of a final judgment in Canada and a subsequent final judgment in Texas recognizing the Canadian judgment.[50] As assets came in that might be available to satisfy his debts, the Debtor transferred them to his wife because he prefers that his wife, and not his creditors, get the assets.[51]

***Fifth***, the cumulative effect of the transfers to Debtor's wife in the one-year period preceding bankruptcy and the time since filing for bankruptcy—all of which were made while knowing that Debtor could not pay his debt to Plaintiff and while Plaintiff pursued collection efforts—was to put substantially all of Debtor's non-exempt assets beyond Plaintiff's reach and into the hands of his own family.[52] As a result, the Debtor filed bankruptcy with apparently little in the way of nonexempt assets to pay Plaintiff, all the while fully satisfying his unenforceable "obligations" ostensibly "owed" to his wife under the unsigned draft marital separation agreement that benefitted Debtor only to the extent that it put his assets beyond the reach of Plaintiff and towards the happiness of his family.

***Sixth***, the following undisputed chronology could only be considered fraudulent by a rational trier of facts:

| Date | Event |
|---|---|
| September 5, 2018 | Loan agreement and personal guarantee signed by the Debtor and CSI. |
| January 1, 2020 | Default on the loan agreement. |
| January 10, 2020 | Plaintiff filed suit in Canada against CSI and the Debtor. |
| 2021 (approx.) | Mediation process with "Julie" begins — the Debtor's first step toward the Draft Separation Agreement. |
| May 2023 | Draft Separation Agreement most recently modified (the same month as the Canadian judgment). |
| May 30, 2023 | Final judgment entered against the Debtor and CSI in Canada. |

[50] **Ex. C**, 40:1–24.
[51] **Ex. C**, 37:11–15; 37:24–38:2; 43:4–5; 45:19–21.
[52] **Ex. C**, 37:11–15; 37:24–38:2; 43:4–5; 45:19–21. *See also generally,* **Ex. E**.

| Date | Event |
|---|---|
| July 3, 2023 | Plaintiff petitioned Texas District Court for recognition of the Canadian judgment. |
| January 24, 2024 | Texas judgment entered in Plaintiff's favor for $1,656,835.67, plus 10% annual interest. |
| September 10, 2024 | $40,000 Bank of America check to Beth Perullo. |
| December 15, 2024 | $6,000 Bank of America check to Beth Perullo. |
| March 28, 2025 | $3,498 Zelle payment to Beth Perullo. |
| March 31, 2025 | $40,000 wire transfer to Beth Perullo (labeled "child support") |
| April 1, 2025 | $20,000 wire transfer to Beth Perullo (labeled "alimony") |
| April 14, 2025 | $90,000 transfer to FOJP LLC for 15 months' rent in advance ($10,000 from Bank of America + $80,000 from Westar Bank) |
| July 8, 2025 | Plaintiff sent discovery deficiency letter; demanded full responses by July 21, 2025 |
| July 17, 2025 | Debtor filed Chapter 7 petition — days before discovery deadline |

The timing of these events is devastating. Notably, the Draft Separation Agreement was most recently modified in May 2023, the same month the original final judgment was entered against the Debtor. Such modification was made with the express purpose of relieving Beth from any obligations for debts incurred by Perullo during marriage, including the substantial obligation owed to Plaintiff. As in *Wiggains*, the couple here designed their agreement "in the shadow of an imminent bankruptcy filing" to shield a portion of the Debtor's assets from his creditors, which "can only be reasonably interpreted as an act done with intent to hinder and/or delay creditors." *In re* Wiggains, 848 F.3d 655, 665 (5th Cir. 2017). Indeed, the chronology here is even more damning than in *Wiggains*: unlike in that case, the Debtor in this case ***openly admitted his intent***. Just as the debtor in *Zouhar* "forthrightly admitted that he merely utilized this method as a device to shield his assets from his creditors," the Debtor here candidly admitted the purpose of his transfers was to protect his spouse from his creditors, not himself from an inequitable divorce. *See Zouhar*, 10 B.R. at 157.

The Debtor's defense is that the payments were all purportedly pursuant to a Draft Separation Agreement that was never signed, has never been approved by any court, and is still being negotiated.[53] Even if the agreement was negotiated at arms-length, the Debtor had no contractual obligation to perform it, and acknowledged only a "moral" obligation.[54] In other words, the Draft Separation Agreement "does not change the relationship of the parties." *In re Teague*, No. 08-51088, 2013 WL 1796080, at *8 (Bankr. W.D.N.C. Apr. 29, 2013), *on reconsideration in part,* No. 08-51088, 2014 WL 911861 (Bankr. W.D.N.C. Mar. 7, 2014). Thus, "it is easy for the court to find that the division of property was a fraudulent transfer." *Id.* "Even if the divorce or separation is valid, the division of property may not be, as a debtor may prefer to transfer assets to an ex-spouse instead of satisfying the claims of creditors, especially if the ultimate beneficiary of the transfer could be the progeny of the marriage." *Id.* Such a separation agreement is illusory, and transfers pursuant to it are fraudulent. *In re Koncicky*, No. BAP.WW-07-1170-MKPAJ, 2007 WL 7540997, at *5 (B.A.P. 9th Cir. Oct. 19, 2007).

Moreover, the Debtor's "moral obligation" defense fails for two additional reasons. ***First***, intangible, non-economic benefits, such as preservation of a marriage or family bonds, do not constitute "reasonably equivalent value" for purposes of the fraudulent transfer analysis. *See, e.g.*, *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000) ("Intangible, non-economic benefits, such as preservation of marriage, do not constitute reasonably equivalent value."). ***Second***, and more fundamentally, Debtor himself admits that the Draft Separation Agreement was merely an attempt to put his moral obligation "in writing," but it was never signed, never notarized, and by its own terms never took legal effect as it was not approved by any court.[55] Debtor acknowledged that without the Draft Separation Agreement, Plaintiff's fraud claim "would have had a better chance"—an acknowledgment that the Draft Separation Agreement was a sham created specifically to reduce the risk of a successful fraudulent transfer claim, not to memorialize a

---

[53] **Ex. C**, 140:7–10; 141:8–9.
[54] **Ex. C**, 139:22–25.
[55] *Id. See also* **Ex. D**.

legitimate legal obligation.[56] Even more bluntly, Debtor testified that "the most important thing of having [the mediator] in there was a format that she told us was what we need to take to the bankruptcy judge in order to get approved."[57]

Further, while spouses may contract to partition or exchange their community property "[a]t any time . . . as the spouses may desire" under the Texas Family Code, such agreements must be "in writing and signed by both parties." Tex. Fam. Code Ann. §§ 4.102, 4.104. This is also true under Massachusetts law. *See* Mass. Gen. Laws ch. 208, § 1A (providing that a joint no-fault divorce requires a "notarized separation agreement executed by the parties"). The Draft Separation Agreement is not dated, not signed by anyone, and has no notary. Therefore, it fails as a matter of law as a partition or exchange agreement, meaning the transfers cannot be justified under the theory that they satisfied an enforceable obligation for value.

Whether a divorce court ultimately enters a divorce decree approving a signed separation agreement substantially similar to the draft Debtor relies on is irrelevant because, at the time of the transfers, no such obligation existed. Moreover, a reasonable fact finder would find that an agreement where the benefits all go "one direction" transferring millions of dollars in value to the wife while the husband is left in bankruptcy unable to pay the millions of dollars he owes to creditors, is an agreement made with intent to defraud the creditors.

Debtor offers an excuse for why he did not finalize the divorce: he alleges that the receivership in Washington over entities he owned, and his subsequent filing of bankruptcy, prevented him from finalizing the divorce in Massachusetts. This is an incorrect assessment of law[58] that cannot be accepted by any rational trier of fact. The receivership was filed in Washington

---

[56] *See* **Ex. C**, 146:1–4; *see also In re Teague*, 2013 WL 1796080, at *9 ("In short, the Debtor apparently sought to shield his assets from his creditors by transferring them to his spouse, and the parties' separation and eventual divorce was simply a tactic used to attempt to avoid any appearance of impropriety.").

[57] **Ex. C**, 163:23–164:1.

[58] Washington receivership law contains a stay, but that stay only applies to property of the receivership estate, not property of non-debtors like Perullo. Moreover, it does not place a stay on marital separation proceedings, and any such stay could have been easily modified. *See* Wash. Rev. Code Ann. § 7.60.110(3)(c) (receivership does not place a stay on any action or proceeding that is to "establish or modify an order for alimony, maintenance, or support"); *see also id.* § 7.60.110(3)(a) (the receiver ship stay under Washington law applies only to the property in receivership, not the individual who owns entities in receivership); *see also id.* § 7.60.110(3)(b) (the stay can be modified by good cause shown). Under Massachusetts law, it is normal for divorce proceedings to play out while

to liquidate the business assets of CSI for the benefit of creditors. The Debtor was not a party to that proceeding and neither the Debtor nor any of his personal or marital property (other than entities that Debtor owned) were put into receivership. The receivership concerned the liquidation of business assets. The Debtor's argument about the receivership for CSI also ignores the months that existed between termination of the receivership and the filing for bankruptcy.[59] Most fundamentally, however, it does not matter. Regardless of the Debtor's excuses, the undisputed fact is that there was no legally binding obligation for the assets that the Debtor transferred to his wife pursuant to the Debtor's preference that she get the assets rather than his creditors.[60] When making transfers to his wife, the Debtor would send his wife whatever she asked for and did not bother to "track" whether the transfers were in excess of what he thought he owed her: "she would tell me I need to send her this, that's what I would send her, and then we move on."[61]

This case is strikingly similar to the *Beverley* case, in which the Ninth Circuit BAP held that the bankruptcy court erred when it found that a debtor's exchange of nonexempt assets for exempt assets pursuant to a marital separation agreement and pending divorce, and in anticipation of a judgment being entered against him, was not fraudulent as a matter of law. The Court concluded that it was "beyond cavil that Beverly's intent was to become judgment proof and not just to protect his assets." *In re Beverly*, 374 B.R. at 246.

**B. Failure to Preserve Records Under Section 727(a)(3) of the Bankruptcy Code**

Section 727(a)(3) provides a further basis to deny the Debtor's discharge in this case. That subsection of the Bankruptcy Code bars a discharge where a debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books,

---

marital property is in receivership. *See, e.g., Kasparian v. Santinello*, 86 Mass. App. Ct. 1105, 11 N.E.3d 1103 (2014). Massachusetts law also permits a divorce decree and separation agreement to be entered when there are major outstanding issues regarding valuation of marital assets. *See Caffyn v. Caffyn*, 70 Mass. App. Ct. 37, 43, 872 N.E.2d 811, 816 (2007).

[59] Two months passed between receivership and bankruptcy. More specifically, the receivership terminated on May 20, 2025. *See State of Washington Vs. In Re Corrugated Synergies International, et. al.*, Case No. 22-2-04065-3 in the Superior Court of Washington, King County. The Debtor filed for bankruptcy on July 17, 2025. *See* Dkt. 1.

[60] **Ex. C**, 139:22–25.

[61] **Ex. C**, 34:1–6.

documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained." 11 U.S.C. § 727(a)(3).

The Debtor has failed to preserve and produce basic financial records. Most critically, Westar Bank (an affiliate of the Debtor's employer) did not provide any documents responsive to Plaintiff's third-party discovery requests, despite being served with a subpoena.[62] The Debtor himself testified that, after filing for bankruptcy, he lost the ability to access documents from certain banks, and that Westar Bank locked him out of his accounts following the garnishment action served by Plaintiff.[63] These are the very accounts through which Debtor transmitted the $80,000 wire transfer to FOJP on April 14, 2025—one of the largest individual transfers identified in the record—and there are no bank records to corroborate or contradict the Debtor's account of those transactions.[64]

Moreover, even certain key exhibits to this Motion (*i.e.*, **Ex. A** and **Ex. B**) were not produced by the Debtor; rather, Plaintiff obtained them through third-party discovery to Bank of America.[65] Other documents Debtor promised but failed to produce include the documents from Weststar Bank,[66] the lease agreement with FOJP,[67] credit card records,[68] images of Debtor's Rolex and other high-end luxury watches sufficient to identify the year and make and model of the watch,[69] and statements from Debtor's unfrozen account at Raiz Federal Credit Union.[70] The Debtor's failure to maintain or produce records makes it impossible to ascertain the full extent of the transfers he made to his wife in the years preceding bankruptcy. A debtor cannot frustrate a creditor's ability to trace transfers and then benefit from a discharge. The withholding of these records, combined with the Debtor's admitted awareness of the pending litigation and active

[62] **Ex. C**, 130:23–131:14; *see also id.* 38:18–22.
[63] **Ex. C**, 107:4–8; 130:23–131:14.
[64] *Id.*
[65] *Id.*
[66] **Ex. C**, 38:18–22.
[67] **Ex. C**, 69:24–70:3.
[68] **Ex. C**, 113:7–114:2.
[69] **Ex. C**, 229:18–230:3.
[70] **Ex. C**, 230:15–21.

judgment enforcement, demonstrates a pattern of concealment that warrants denial of discharge under § 727(a)(3).

## VI. CONCLUSION AND PRAYER FOR RELIEF

The record in this case is extraordinary. The Debtor does not dispute that he transferred hundreds of thousands of dollars to or for the benefit of his wife in the year preceding his bankruptcy filing. He does not dispute that Kruger held a final judgment against him in excess of $1.6 million at the time of those transfers. And he does not dispute that he made zero payments to Kruger during that same period. What makes this case exceptional is that the Debtor has openly admitted, under oath, precisely what he did and why he did it: faced with a creditor he could no longer avoid, he chose to put his remaining assets in the hands of an insider and file for bankruptcy.

By transferring property to his wife with the intent to hinder, delay, or defraud at least one of his creditors, the Debtor violated Section 727(a)(2) of the Bankruptcy Code and is not entitled to a discharge in this bankruptcy case. No genuine issue of material fact remains. The undisputed evidence—including the Debtor's own sworn admissions—establishes each element of Plaintiff's claim as a matter of law.

Plaintiff respectfully requests that this Court grant summary judgment in its favor and enter judgment denying the Debtor a discharge pursuant to 11 U.S.C. § 727(a)(2) of the Bankruptcy Code, on the grounds that the Debtor, with intent to hinder, delay, or defraud a creditor, transferred property within one year before the date of the filing of the petition.

Dated: July 20, 2026.

Respectfully submitted,

**K&L GATES LLP**

*_/s/ David Wills_*

David Wills
State Bar No. 2412717
David.Wills@klgates.com
2828 N. Harwood Street, Suite 1800
Dallas, Texas 75201
(214) 939-5873 Telephone

**ATTORNEY FOR KRUGER PACKAGING LP**

**CERTIFICATE OF SERVICE**

This is to certify that on July 20, 2026, pursuant to L. Rule 9013-1(d)(2), a true and correct copy of the foregoing was served on all counsel of record via electronic filing.

*/s/ David Wills*
David Wills